[Cite as *Gudenas v. Gudenas*, 2024-Ohio-3009.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

EDMUND GUDENAS,                  :

    Plaintiff-Appellant,          :

                           Nos. 113113 and 113114

    v.                            :

JONAS ALGIS GUDENAS,             :
SUCCESSOR TRUSTEE, ET AL.,
                             :

    Defendants-Appellees.

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 8, 2024

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Probate Division
Case Nos. 2021ADV257586 and 2013EST190095

---

### *Appearances:*

Cavitch, Familo & Durkin Co. LPA, and Bradley Hull IV,
*for appellant.*

Sirvaitis Law, LLC, Brenda T. Bodnar, and Egidijus
Marcinkevicius, *for appellee.*

FRANK DANIEL CELEBREZZE, III, J.:

{¶ 1} The instant appeal concerns two brothers: Edmund Gudenas ("Ed") and Jonas Algis Gudenas ("Al"). Ed brings the instant appeal as a result of the trial court's judgment on his complaint for breach of fiduciary duty, accounting,

surcharge, and other relief. After a thorough and careful review of the relevant law and facts, this court affirms.

## I. Factual and Procedural History

### A. History of the Trust and Opening of the Estate

{¶ 2} Al and Ed's father, Jonas Gudenas ("Father"), created the "Jonas Gudenas Trust" ("Trust") on February 10, 2011. Father passed away on December 12, 2012, and his will provided that all of his estate, except for his personal property, should be placed into the Trust. Ed testified that he was undergoing significant litigation in 2011 and encouraged Father to create the trust to shield his inheritance assets and further testified that he told his Father to refrain from naming him as the successor trustee for this same reason. Father's will was admitted to probate on June 24, 2013, and assigned Cuyahoga P.C. No. 2013EST190095 ("the estate case"). During his lifetime, Father was the trustee of the Trust, and after his death, Al became the successor trustee. Father's will provided that all contents of the Trust were to be split 50/50 between the two brothers.

{¶ 3} Al filed the final inventory in the estate case on September 29, 2014, and it was approved by the court without objection from Ed on November 10, 2014.

{¶ 4} The estate was reopened in July 2019 when Al discovered another account with Ameriprise Financial. This reopening became contentious when Ed filed objections to Al's partial accounting, noting that Al failed to disclose assets including real estate located in Lithuania, a vehicle, gold coins, and investment growth within a Merrill Lynch account. As a result, Ed sought appointment as the

trustee, claiming that Al had breached his fiduciary duties in failing to distribute Trust assets.

{¶ 5} During this time, Ed filed a separate complaint in probate court on February 3, 2021, which was assigned Cuyahoga P.C. No. 2021ADV257586 ("the adversarial case"). The complaint sought relief for breach of fiduciary duty, accounting, and removal of Al as trustee of the Trust. On June 7, 2022, Al was granted leave to file a counterclaim and made claims of unjust enrichment against Ed stemming from funds related to a Dreyfus account, a loan in the Merrill Lynch account that prevented distribution of the Merrill Lynch account, and Ed's alleged residence at a home in Euclid ("the Euclid home") owned by the Trust, that prevented Al from selling the Euclid home.

{¶ 6} The parties engaged in discovery and significant motion practice and attempted settlement. Ed filed for summary judgment on September 2, 2022. At a status hearing on February 17, 2023, the trial court ordered that all responses to pending motions be filed by March 3, 2023.

{¶ 7} On March 14, 2023, the trial court ruled on all outstanding motions, including denying summary judgment.

{¶ 8} The matter proceeded to trial on June 12 and 14, 2023. After trial concluded, the court denied Ed's request to remove Al as trustee and denied his claims for breach of fiduciary duty, accounting, surcharge, and other relief. The trial court concluded that Ed had not proven any damages resulting from these alleged

claims. The trial court found in favor of Al on his counterclaims for unjust enrichment.

{¶ 9} The facts and issues in this case may largely be divided into three distinct issues that we discuss below and further discuss as we reach each assignment of error.

## B. The $150,000 Merrill Lynch Loan

{¶ 10} When the estate was opened for the first time, several accounts were liquidated and placed into the estate checking account with Chase Bank. The Merrill Lynch account, despite being listed on the final inventory of the estate, was not liquidated to the estate checking account and remained open at the time of trial due to the outstanding loan balance.

{¶ 11} Testimony adduced by both parties indicates that Al and Ed agreed that around the time of Father's death, the Trust would take out a $150,000 loan, secured by the contents of the Merrill Lynch account held by the Trust. Ed received the entire benefit of this loan and none of the proceeds ever went into Al's possession. Nonetheless, the Merrill Lynch account had to remain open and carry a certain balance so long as the loan remained outstanding.

{¶ 12} During trial, Ed explained that at the time he took out the loan, he was attempting to settle some litigation and was $150,000 short and was required to make his payment by a strict deadline, so he was in dire straits. After the estate checking account received the loan, Al, as trustee, made a check payable to Island Productions (Ed's company) in the amount of $280,000; $150,000 came from the

loan proceeds and $130,000 consisted of a distribution from the other liquidated accounts within the estate checking account.

{¶ 13} The parties stipulated that on August 13, 2013, Al and Ed signed a power of attorney giving Ed certain abilities with respect to the Merrill Lynch account. Ed acknowledged that the power of attorney gave him the ability to sell shares in the account but could not directly receive proceeds from the stock sales, and that he frequently communicated with the Merrill Lynch account representative, Craig Wahl. Moreover, in November 2019, Ed, Al, and Craig Wahl orchestrated the sale of shares in ZBH Holdings, the proceeds of which were applied to the Merrill Lynch loan.

{¶ 14} The parties agree that the loan is currently active and has only been paid back "solely from existing assets within the Merrill Lynch account." Ed testified at trial that he did not want to immediately split the Merrill Lynch account because he wanted to keep his shares and take the maximum loan, which could not exceed 50 percent of the total shares in the Merrill Lynch account. Ed testified that he was hoping that appreciation of the value of the stocks within the Merrill Lynch account would inflate enough to pay off the $150,000 loan.

{¶ 15} Between 2013 and 2018, the brothers communicated sporadically about the Euclid property and about acquiring some of their Father's assets in Lithuania.

{¶ 16} However, in 2018, Ed began to email Al regarding selling shares within the Merrill Lynch account, noting that he had another loan coming due and

needed more money from the Trust. In March 2019, Al provided Ed with a spreadsheet demonstrating that Ed had exhausted his share of the trust and, in fact, still owed on the $150,000 loan and the interest that had accrued.

{¶ 17} This loan forms the basis of many of the issues in this case because taking out the loan caused Al and Ed to delay immediately dividing the Merrill Lynch account and interest has accrued on the loan since it has not yet been repaid. This created questions as to whether Father's estate was equally divided between the brothers, as provided for in Father's will. Additionally, the Merrill Lynch account is an investment account that has fluctuated throughout the years, further complicating the issue.

## C. Division of Father's Estate

{¶ 18} Another issue in this case was whether Father's estate was equally divided between the brothers, and whether Al breached his fiduciary duty in failing to carry out this mandate. Ed maintained that he was still owed outstanding money from the Trust while Al maintained that Ed was overpaid by the estate because he still owes the estate all of the $150,000 loan balance and all interest that has accrued on the loan.

{¶ 19} It is undisputed that each brother received $12,000 each from the estate. Ed received an additional $280,000, $150,000 of which were the proceeds of the aforementioned Merrill Lynch loan and the other $130,000, a cash distribution from the estate checking account. Ed later received another $36,000 by check (made payable to his company, Island Productions).

{¶ 20} The estate inventory filed in the probate case showed assets totaling $709,499.25. No objections were received, and the probate court approved the inventory; the final account was filed; the final account received no objections and was approved; and the estate was closed.

{¶ 21} Ultimately, the trial court agreed with Al — that Ed had been overpaid and owed money back to the estate for the loan. In so deciding, the trial court made the following findings of fact and conclusions of law relevant to the distribution of the estate in light of the loan that Ed had received and allegedly had not paid back:

> The brothers agree that there was no written agreement between them regarding the loan. Al testified that he believed the loan to be short term. This is also reflected in email communications to Ed in 2018-2019 (Plaintiff's Exh 7). Ed claims there were no terms and that his intention was to allow the shares to increase in value and to sell the shares to pay off the loan. There is no dispute that the $150,000.00 loan proceeds were given to Ed for his exclusive use. There is no dispute that Ed never paid back the loan or any interest payments thereon.
>
> . . .
>
> The emails show that in 2018 Ed began to inquire about his interest in the Merrill Lynch account. He did not communicate about his duty to repay the loan but instead he communicated to Al that he had another loan coming due and that he needed his share of the Trust to pay the loan. Ed informed Al that the Boeing stocks had increased in value and that Al should consider selling shares so that Ed could access funds to pay another loan coming due. On March 8, 2019, Al provided Ed with a spreadsheet showing the Trust account activity, including expenses, and balances as well as information regarding Ed's loan. The spreadsheet included information received from Merrill Lynch that showed the account activity, including the interest payments accrued on the loan as well as payments on the loan that Al had approved. (Plaintiff's Exh 7, p. 68 and Exh 22).
>
> . . .

The Court finds that there is no evidence that Ed sought information regarding the Trust account, other than what he was able to obtain directly, from 2013 until 2017.  There is no evidence that Ed took any steps to inquire about the status of the loan or make any effort to pay toward the interest or principal until 2018.

. . .

The Court finds that the Trust account was not divided into shares from its inception due to Ed's request for a loan that could not exceed 50% of the entire Trust account.

. . .

Section 4.03 of the Trust provides that "the duration of my trust and the distribution of my assets to any beneficiary shall be determined by my trustee." [Al] was unable to finalize distribution of the trust so long as the loan remained due.  To date, the loan has not been repaid.  The Court finds from the evidence, including emails between the parties and the creation of a Power of Attorney for the Merrill Lynch Account, that [Al] intended for [Ed] to have an interest in the Trust, at least until his loan was paid and final distribution could be made.  In addition to the loan, the Euclid property remained in Trust and the evidence shows that [Ed] used the residence at his convenience both as a place to stay when he was in town and a place to store his belongings and his vehicle.  Also, during the pendency of the Trust, the parties reopened the Estate to claim newly found assets.

### D. The Dreyfus Account

{¶ 22} The adversarial case contained a counterclaim made by Al for unjust enrichment arising from funds that Al gave to Ed following Father's death from an account with Dreyfus Fund, Inc., a BNY Mellon Company ("the Dreyfus account"). These funds were not listed on the estate inventory and, for all intents and purposes, are separate and distinct from the estate.  As it turns out, Al was the sole transfer-on-death beneficiary on the Dreyfus account but, in his counterclaim, alleged that

he mistakenly believed the funds were part of the estate and gave half to Ed, at Ed's insistence.

{¶ 23} Ed testified that after Father died, he, having knowledge of the Dreyfus account, called Dreyfus to ask who the beneficiary was on the account. Dreyfus informed Ed that they could not provide that information over the phone but suggested sending a letter along with a death certificate inquiring about the beneficiary. (Tr. 245.)

{¶ 24} After Ed sent the letter on his behalf, Dreyfus indicated that Ed was not the beneficiary of the account. He did not know who the beneficiary was, and therefore, suggested to Al that he send the same letter to Dreyfus to see if he was the beneficiary. The response confirmed that Al was the sole transfer-on-death beneficiary to the Dreyfus account.

{¶ 25} Ed prepared the same letter on behalf of Al, presented it to Al for signature, and sent it to Dreyfus, asking for Dreyfus to make a full distribution of the funds in the Dreyfus account to Al's personal account.

{¶ 26} The parties are in agreement that Al, after receiving these funds, went to the bank accompanied by Ed and distributed exactly half of the Dreyfus account money to Ed.

{¶ 27} The parties disagree as to the intent and nature of the transfer. Ed maintains that the Dreyfus funds were a gift from Al, while Al maintains that Ed mislead Al into believing the funds were part of the estate and were therefore, meant to be divided equally among the brothers. Additionally, during trial, Ed moved for

a directed verdict on the issue of unjust enrichment as it pertained to the Merrill Lynch account as well as the Dreyfus account funds, claiming that the statute of limitations had long passed by the time Al filed his counterclaim. Al maintained that the statute of limitations was properly tolled because Ed admitted that he was out of state and indeed, the country, at St. Barthelemy, a French territory in the Caribbean. The trial court denied the directed verdict as premature at trial, and reconsidered the issue in its final judgment entry, noting that the statute of limitations was properly tolled while Ed was in St. Barthelemy.

{¶ 28} At the close of trial, the trial court ordered that Ed was entitled to "his net share of the Trust account" in the amount of $36,159.01, which was offset by prior distributions received in the amount of $166,000. Therefore, the trial court determined that Al was entitled to the difference: $129,840.99 as well as an additional $157,759.60 on Al's claims for unjust enrichment. It is from this judgment that Ed appeals, assigning six errors for our review.

> I. The trial court committed reversible error in determining that Al Gudenas was entitled to received back the gift he gave to Ed of $157,759.60.

> II. The trial court committed reversible error in determining that Ed Gudenas owed the trust back money.

> III. The court committed reversible error in failing to find that Al Gudenas violated multiple fiduciary duties and that he should remain as trustee.

> IV. The trial court committed reversible error in making no findings of fact about the distribution of the Euclid house, gold coins, automobile or Ameriprise account.

V. The trial court improperly accepted Al Gudenas' closing argument statements as facts, instead of the evidence presented at trial, to determine the issue of tolling for Al Gudenas' unjust enrichment claims.

VI. The court committed reversible error in excluding the report and testimony of Robert Ranallo.

## II. Law and Analysis

{¶ 29} We address the assignments of error together and out of order where applicable for ease of discussion throughout.

## A. Tolling of the Statute of Limitations

{¶ 30} In his fifth assignment of error, Ed argues that the trial court erred in determining that the statute of limitations for Al's claims of unjust enrichment against him had been tolled. He notes that the trial court's judgment "made a finding of dates and years that were not part of the litigation or in evidence," disputing that dates only covered in closing arguments were wrongfully considered by the trial court.

{¶ 31} Relevant to this assignment of error, the court found:

The Court finds that by his own testimony, Ed established that there were significant amounts of time between 2013 and the filing of the Counterclaim that he was out of the Country at St. Barts Island. In his written closing statement Al sets forth in detail the dates during which Ed was out of the state, according to his own testimony, which adds up to 4.3 years. The Court finds that by tolling these periods of absence from the state, Al was within the applicable statute of limitations when his Counterclaim was filed.

(Judgment Entry 7/25/23.)

{¶ 32} R.C. 2305.15 provides that the statute of limitations for bringing an action against a person does not begin to run "if the person is out of the state, has absconded, or conceals self." A claim for unjust enrichment is subject to a six-year statute of limitations. R.C. 2305.07. The claim accrues on the date that the money is wrongfully retained. *Palm Beach Co. v. Dun & Bradstreet, Inc.*, 106 Ohio App.3d 167, 175 (1st Dist. 1995). Here, the earliest date that a cause of action would have accrued would have been the date the Dreyfus account funds were retained by Ed: July 20, 2013. Six years from then was July 20, 2019. Al's counterclaim, however, was filed on July 21, 2022. Nonetheless, evidence was presented at trial that Ed was frequently out of the country in St. Barthelemy's during the period between July 20, 2013, to July 20, 2019. Therefore, pursuant to R.C. 2305.15, the trial court was required to determine the amount of time that Ed had been out of state and in turn, how long the statute of limitations had tolled.

{¶ 33} During Ed's direct examination, he testified that his "pattern" of residency is that he spends the spring and summer in Middle Bass Island, Lake Erie and spends his winters in St. Barthelemy. He testified that in 2013, he left in late October and "probably came back a little bit in '14, but then, after '14, I would generally stop at the house for a few days in April, when I came back from the south, to check on the house after the wintertime[.]" (Tr. 287.) Given that Middle Bass Island is geographically north of Euclid and St. Barthelemy is "south" of Euclid, it appears from his own testimony that from approximately October through April, Ed had been "south" in St. Barthelemy.

{¶ 34} Using this testimony, Al, in his closing brief, conservatively estimated the months that Ed was away from Ohio and determined that Ed was not present for 4.3 years after the Dreyfus funds were delivered to Ed.

{¶ 35} On appeal, Ed does not dispute Al's math or offer any alternative mathematical calculations. He merely argues that the dates and years considered by the trial court were not properly in evidence. We, however, find no merit to this argument. Al utilized testimony that Ed himself presented at trial to generate actual numbers from which the trial court could determine the times that Ed was not in the state. Ed had an opportunity to respond to or refute these numbers by presenting his own evidence to the contrary, but he did not.

{¶ 36} The trial court did not err in accepting Al's calculations that were generated based on testimony received from Ed during the trial in considering the tolling of the statute of limitations on the unjust-enrichment claims.

{¶ 37} We therefore overrule Ed's fifth assignment of error.

**B. Unjust Enrichment – the Dreyfus Account and Trust Distribution**

{¶ 38} In his first assignment of error, Ed contends that the trial court erred in determining that the distribution that he received from the Dreyfus account was owed back to Al. In his second assignment of error, Ed contends that the trial court erred in determining that Ed had been "overpaid" and unjustly enriched by the Trust and owed $129,840.99 back.

{¶ 39} When reviewing civil appeals from bench trials, an appellate court applies a manifest weight standard of review. *Revilo Tyluka, L.L.C. v. Simon*

*Roofing & Sheet Metal Corp.*, 2011-Ohio-1922, ¶ 5 (8th Dist.), citing App.R. 12(C); *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77 (1984). Judgments supported by some competent, credible evidence going to all the material elements of the claim must not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus. *See also Gerijo, Inc. v. Fairfield*, 70 Ohio St.3d 223 (1994). Reviewing courts must oblige every reasonable presumption in favor of the lower court's judgment and findings of fact. *Gerijo* at 226, citing *Seasons Coal Co.* If the evidence is susceptible to more than one interpretation, we must construe it consistently with the lower court's judgment. *Id.*

{¶ 40} "Unjust enrichment occurs when a person 'has and retains money or benefits which in justice and equity belong to another.'" *Johnson v. Microsoft Corp.*, 2005-Ohio-4985, ¶ 20, quoting *Hummel v. Hummel*, 133 Ohio St. 520 (1938). To prevail on an unjust-enrichment claim, the plaintiff must demonstrate, by a preponderance of the evidence, that "'(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment ("unjust enrichment").'" *Cleveland Cent. Catholic High School v. Mills*, 2018-Ohio-4873, ¶ 42 (8th Dist.), quoting *Johnson* at *id.*

{¶ 41} We first address the Dreyfus account. The court made the following findings in its judgment entry dated July 25, 2023:

The Court finds that with regard to the Dreyfus account the evidence establishes that Al, in reliance on representations by Ed, and because of his misplaced trust in Ed, agreed to transfer [] one half of the account, in the amount of $157,759.60 to Ed. The Court finds that Ed was never entitled to proceeds from the Dreyfus account and finds that he has been unjustly enriched by his receipt of money from that account.

{¶ 42} Al, as the plaintiff of his counterclaim, was required to demonstrate all the elements by a preponderance of the evidence. A preponderance of the evidence "simply means 'evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it.'" *Holliday v. Calanni Ents.*, 2021-Ohio-2266, ¶ 21 (8th Dist.), quoting *In re Starks*, 2005-Ohio-1912, ¶ 15 (2d Dist.). Ed appears to contend that Al did not demonstrate the third prong: that retention of the Dreyfus money was unjust. Ed maintains that the transaction does not constitute unjust enrichment because Al had donative intent at the time the Dreyfus funds were given to Ed and, thus, Al merely gave Ed an inter vivos gift.[1]

{¶ 43} The essential elements of an inter vivos gift are "(1) intent of the donor to make an immediate gift; (2) delivery of the property to the donee; and (3) acceptance of the gift by the donee after the donor has relinquished control of the

---

[1] Ed raises the presumption that any inter vivos transfer between family members is a gift. *Kovacs v. Kovacs*, 2011-Ohio-154, ¶ 12 (6th Dist.). Ed did not raise this presumption at the trial-court level, so it was not considered by the trial court. Ed argued at the trial-court level that the Dreyfus funds constituted an inter vivos gift. We therefore review whether the transfer was an inter vivos gift without the benefit of the presumption, because such presumption was not properly before the trial court. *Sizemore v. Smith*, 6 Ohio St.3d 330, 333, fn. 2 (1983) ("[J]ustice is far better served when it has the benefit of briefing, arguing, and lower court consideration before making a final determination."); *AMF, Inc. v. Mravec*, 2 Ohio App.3d 29, 32 (8th Dist. 1981) ("A party may not assert a new legal theory for the first time before the appellate court.").

property." *Jacobson v. Resnick*, 2020-Ohio-5424, ¶ 21 (8th Dist.), citing *McLeod v. McLeod*, 2002-Ohio-3710 (11th Dist.).  Additionally, "[a] gift is a voluntary transfer of property from one to another without any consideration or compensation[.]" *Saba v. Cleveland Trust Co.*, 23 Ohio App. 163, 165 (8th Dist. 1926).

{¶ 44} At trial, Al testified that he gave the Dreyfus account money to Ed because he "thought it was part of the trust — or the estate — I had a problem mixing them together —."  (Tr. 46.)  Al testified that he later learned that the Dreyfus account money was solely in his name as a transfer-on-death beneficiary, but at the time he distributed the funds to Ed, he thought the Dreyfus account was part of the estate or the trust.  He testified that he made a "mistake" in giving Ed the money, testifying that

> I was pressured by [Ed] that he needed the money right away, and there's some sort of mistake on the account and the only way to get the money without going through probate, or something like that, or I don't know what the deal was, that I had to sign for it and then split it up.

(Tr. 48.)

{¶ 45} Al testified that Ed deceived him and caused him to split the Dreyfus account equally between the two brothers.  He testified that he believed the money was part of the estate, that he was required to give it to Ed, and that the reason he gave Ed the Dreyfus money was "to satisfy his 50% of what he's entitled to per the will." (Tr. 85.)  These statements indicate that Al did not necessarily have donative intent because he believed that it was "part of the money that my brother was entitled to get as getting 50% per the will." (Tr. 82.)

{¶ 46} Additional testimony elicited from Al indicated that the Dreyfus account was not listed on the final inventory for the estate. When questioned why he signed the inventory without listing the Dreyfus account, Al responded that he believed the inventory was "a mere formality to sign" and that he did not look very carefully at it. (Tr. 54-55.)

{¶ 47} Ed testified that he did not feel that he was aggressive or pressured his brother into giving him half of the Dreyfus funds. Ed testified that Al "volunteered that he was going to give me some money from the account." (Tr. 253.) He also testified that "[w]e didn't discuss it at length, and [Al] just decided and I wasn't going to argue." (Tr. 253.)

{¶ 48} After careful review of the record and evidence therein, we cannot say that the trial court's determination that Ed was unjustly enriched by receipt of the Dreyfus account funds was not supported by competent, credible evidence in the record.

{¶ 49} The trial court, upon hearing both theories, chose to believe Al's theory and determined that Ed was unjustly enriched by receiving half of the Dreyfus account funds. Competent, credible evidence supports this determination. This is also consistent with the trial court finding, from Al's testimony, that he did not have donative intent when he gave the funds to Ed.

{¶ 50} Ed's first assignment of error is overruled.

{¶ 51} We next turn to Ed's second assignment of error, claiming that the trial court erred in determining that Ed was unjustly enriched because of the Merrill

Lynch loan distribution and ordered him to pay the overpayment amount, $129,840.99 back to Al. Ed argues that the trial court "incorrectly determined that all liability for interest on the loan must be apportioned to Ed, incorrectly gave too much reimbursement to Al for expenses while giving none to Ed, and most of all, incorrectly determined that Ed had received $166,000 in distributions more than Al had, and that as a result Ed owes the Trust back that difference."

{¶ 52} Since the trial court held that Ed was unjustly enriched in the amount of $129,840.00 and ordered him to pay that back to Al, we apply the same manifest weight standard of review as employed above and determine whether competent, credible evidence in the record supports the trial court's determination. We begin by examining whether the trial court's unjust enrichment calculation is supported by competent, credible evidence in the record.

{¶ 53} On June 9, 2023, the parties filed a document stipulating to certain facts that included the following that are relevant to this assigned error:

9. During the course of the Probate administration, the parties agreed that the Trust would take a $150,000 Loan secured by the Trust's Merrill Lynch account . . . and provide the proceeds to Ed[.]

10. On August 13, 2013, Al and Ed signed a Merrill Lynch Power of Attorney giving Ed certain powers and abilities with regard to the Merrill Lynch account.

11. Those Loan proceeds were provided to Ed on October 1, 2013 by a check in the sum of $280,000 to Island Productions, of which sum $150,000 was the Loan proceeds and another $130,000 was a distribution of Estate assets, a true copy of which is included with the stipulated documents of which the Court received formal Notice on June 8, 2023.

. . .

13. The Merrill Lynch Margin Loan still exists, the Trust was never in default to Merrill Lynch, and payments have been made on the loan solely from existing assets within the Merrill Lynch account . . . as detailed in Craig Wahl's e-mails, a true copy of which are included with the stipulated documents of which the court received formal Notice on June 8, 2023.

{¶ 54} The stipulated facts also indicate that the parties agree that Ed received distributions in the amount of $12,000 and $36,000 and Al received a single $12,000 distribution.

{¶ 55} On appeal, Ed makes numerous arguments disputing the trial court's factual findings, nearly all of them without citations to the record and without pointing us to contradictory evidence that the court may have missed or failed to consider. As such, we address Ed's arguments as best as we can with the information we have in the record before us, keeping top of mind that we need only consider whether the record contains competent, credible evidence to support the trial court's findings and calculations.

{¶ 56} Initially, we note that the formula that the court employed was the formula proposed by Ed. On appeal, Ed concedes that the trial court "accepted the proper framework for consideration of the liquidation of the Merrill Lynch Account and loan, specifically of the Trust paying off the loan in full, then making a distribution to Al of $150,000 to serve as an equalization payment to Al of the initial $150,000 loan to Ed." Moreover, Ed concedes that the trial court correctly found

that "Ed elected to receive a loan from the Merrill Lynch account in order to preserve stock shares in the hope that [the stock shares] would increase in value."

{¶ 57} Ed, however, contests the court's starting number. Since the Merrill Lynch account is an investment account, it has changed and fluctuated throughout the years since the final account was filed, so the trial court, before making any calculations, needed to choose a starting number from which to make its calculations. Ed argued that the court should utilize the value of the Merrill Lynch account as of April 28, 2023, which was $506,489.29, the most recent balance available at the time Ed filed his closing brief. Al argued that the trial court could start with the value of the estate at the time the final accounting was filed, which was $709,499.25 *or* "the inventory value plus appreciation on the Merrill Lynch account, $753,873.00." The trial court was more inclined to follow Ed's suggestion, but used the most recent number in the record, the balance reflected on a June 2023 statement, which was $488,969. We cannot say that the court's choice to start at this number is unsupported by competent, credible evidence.

{¶ 58} After settling on the $488,969 starting point, the court specifically used the formula set forth by Ed and concluded that the outstanding loan balance, $123,731.76 was to be paid prior to any distributions from the account, leaving the remaining distribution amount at $363,237.24. The trial court then found, "To equalize distribution, [Al] is entitled to $150,000 from the Trust prior to a further division between the parties." Subtracting this $150,000, the available money left for distribution is $213,237.24. Ed also does not contest that Al is entitled to an

equal distribution of $150,000, and indeed, Ed included this figure in his suggested calculation.

{¶ 59} The trial court then determined that Ed would be responsible for all of the interest payments incurred as a result of the loan based on his decision to receive the loan "rather than to take direct distribution or wait for the stock to increase in value before taking his share." The statement reflects that as of June 1, 2023, the interest charges were $71,256.84. Ed disputes the trial court's finding that he should be responsible for this whole amount because the evidence adduced at trial indicates that he did not take out the loan but the Trust did, and therefore, the Trust should be liable for the interest payments. Ed also argues that he should not be responsible for that amount because his attempts to pay down the Trust were stonewalled, either because he did not have the proper authority to sell his shares to pay off the loan or did not think he had the proper authority and argued that Al prevented him from paying down the loan and did not listen to him when he asked to sell stock shares. Ed also seems to argue that the court "failed to include substantial dividend and interest income that the [Merrill Lynch] account generated to offset the interest charged." He makes this conclusory point but does not suggest any numbers or calculations within the record demonstrating what this amount should be.

{¶ 60} We, however, note that the record is ripe with evidence indicating that the loan was solely for Ed's benefit, that the Merrill Lynch account remained open solely because of Ed's choice to take out the loan, and that the proceeds of the loan

were specifically for Ed's benefit. In fact, Al's testimony indicates that he probably would have immediately liquidated and split the account if not for Ed's choice to take a loan against the Merrill Lynch account. Moreover, the competing evidence at trial indicates that Ed knew or had access to his capabilities concerning the account and indeed was able to sell certain shares to begin paying down the loan. Therefore, the record contains competent, credible evidence supporting the court's conclusion that Ed should be liable for the total interest payments.

{¶ 61} Subtracting the interest payments from the remaining amount for distribution as of June 1, 2023, the available funds for distribution are $141,980.40 ($213,237.24 - $71,256.84 = $141,980.40). The trial court then divided this total and found that each brother would be entitled to $70,990.20 from the Merrill Lynch account.

{¶ 62} However, the trial court found that Al paid Trust expenses out of pocket in the amount of $34,831.19 and determined that this amount is owed to Al. The court subtracted this amount from Ed's share and found that Ed's share had been reduced to $36,159.01. Ed disputes the court's finding that Al is owed these out-of-pocket expenses and argues that they should be offset by amounts that Ed paid out of pocket for maintenance of the Euclid house, offering $25,000 as a number that was corroborated by Ed's testimony at the trial. In the alternative, Ed argues that this number is too high but does not point us to any document demonstrating an alternative number. He also argues that since Al did not sell the Euclid house earlier, he is not entitled to these expenses at all since they would not

exist. This argument is unfounded by the numbers. Plaintiff's exhibit No. 22 demonstrates that some of these expenses were for paying a Lithuanian attorney to complete a land transaction in Lithuania and tax preparation for the Trust account. This information was all before the court as it made its calculations, and we cannot say that the court's decision to offset the out-of-pocket Trust expenses is not supported by competent, credible evidence.

{¶ 63} After reducing Ed's share to $36,159.01, the trial court noted that Ed received $166,000 from the estate in excess of what Al received, and after subtracting $166,000 from $36,159.01, the trial court found that Ed had been overpaid by $129,840.99 that he was required to pay back.

{¶ 64} Ed makes several allegations that the court should not have offset any sums from the Merrill Lynch account because after the final inventory was filed in probate court, "Al gave himself half and or more than half of all outstanding accounts," but fails to support this contention with a number or documentation showing as much. During oral argument and in his reply brief, Ed argued that on September 27, 2014, Al signed a "Receipt of Trustee" for $542,317.89, which was taken from the Estate of Jonas Gudenas and placed in the Trust, and notes that this indicates that "Al received distributions of well more than half of the Estate and Trust, making the Probate Court's own records specifically disprove the Probate Court's ruling that Al had only received $12,000 of distributions."

{¶ 65} This is a misrepresentation of concrete facts. The final account demonstrates that of the total final inventory, valued at $709,499.25, the

$542,317.89 was distributed to the estate checking account. $542,317.89 is the total value of the estate after all receipts were totaled (including, but not limited to, funds from Vanguard, Wells Fargo, American Century Investments, and the very Merrill Lynch account involved in this litigation), minus the disbursements associated with the estate, including burial expenses, taxes, insurance, and filing costs. It is undisputed that of these receipts, the Merrill Lynch account had never been liquidated or distributed.

{¶ 66} Ed and Al agreed that most of these accounts were immediately liquidated and split and that the only accounts that had not been liquidated immediately were an Ameriprise account and the Merrill Lynch account that is the primary subject of this litigation. Ed admits as much in his brief when he states that "[m]ost assets were liquidated immediately and were not subject to market changes," and Al's testimony at trial corroborates this:

> [ED'S COUNSEL]: Okay. But, you actually gathered the American Century investments and Wells Fargo and then the credit union money on Schedule C very quickly, after your father died and you were appointed as the executor, correct?
>
> [AL]: Did you say that I liquidated them?
>
> [ED'S COUNSEL]: You gathered them up and you —
>
> [AL]: What does that mean?
>
> [ED'S COUNSEL]: Liquidated them and put them in the estate checking account very quickly.
>
> [AL]: Yes. We liquidated them.

[ED'S COUNSEL]: So they weren't subject to market fluctuations after you liquidated them early on the services executor? [sic]

[AL]: Obviously, not.

(Tr. 112.)

{¶ 67} Moreover, everything relating to the final inventory and accounting had been approved and finalized; it is clear that the only question before the trial court and before us pertains to dividing the remaining funds in the Merrill Lynch account, which were not immediately liquidated because the brothers agreed that Ed could take out a loan on the account. Moreover, the Merrill Lynch account could not be immediately liquidated because the loan could not exceed 50 percent of the entire Trust account, so the money needed to remain in the account. Even Ed acknowledged this at the trial-court level when he, himself, suggested that the trial court's mathematical starting point should be the value of the Merrill Lynch account as opposed to the entire final account value, which was Al's suggestion.

{¶ 68} Ed also takes issue with certain factual findings that guided the court's calculations.

{¶ 69} Ed contends that the trial court erred in determining that all of the interest accrued on the loan should have been allocated to Ed. He argues that just because Al gave Ed power of attorney over the Merrill Lynch account does not mean he had the same access to the functions that Al did, such as receiving statements and "tak[ing] action to pay down the loan." Ed further argues that he "cause[d] two payments to be made to pay down the loan," that "the Merrill Lynch loan was not

Ed's loan to repay," and that "Ed asked Al to sell Ed's shares to repay the loan" and that "Al had refused."

{¶ 70} At trial, Al testified that he, as trustee, took out the loan on behalf of the Trust. Both parties agree that the loan was a margin loan, which means that there was no repayment date. Ed, who needed the loan for a personal financial situation at the time, explained why he wanted to take a loan out against the account rather than directly take his half of the Merrill Lynch account at that time:

> Well, I looked at the Merrill Lynch account and I had asked him if I could, or if the trust could take out a loan from the Merrill Lynch account and provide that loan proceeds to me, $150,000, because I was very specific, stating that I believe that the Boeing stock around $70 a share, was much undervalued. There was like 1,200 shares in there, 600 each of us had. And I thought this would not be a good time to liquidate that account. The other accounts, I agree that we should liquidate, because they are mutual funds and they weren't performing very well.
>
> But, in my opinion, Boeing was going to go way up because big financial recession was ending, travel was coming back, airlines were able to finance purchase of planes and the like. And so I specifically asked that we do a loan, instead of me selling any shares, because, then, that time in October was a bad time to sell the shares. And he agreed with that.

(Tr. 265-266.)

{¶ 71} Al testified that in roughly 2018, the loan still had not been paid back so he determined that the loan was no longer a loan and instead constituted a distribution. When asked why he suddenly demanded the loan repayment, Al stated that he was "more than reasonable," having distributed the loan proceeds to Ed on October 1, 2013. (Tr. 137.) Al testified that in retrospect, he should have just cashed out the Merrill Lynch account at the time and given Ed half, but Ed insisted on taking

out a loan against the Merrill Lynch account because it was advantageous to Ed to take the money out as a loan rather than liquidate the account and receive a distribution. (Tr. 152.)

{¶ 72} Al also testified that the brothers never agreed on a date to repay the loan, but that they had verbally agreed that the loan would be "short term." Ed agreed that while they did not discuss an actual date of repayment, Ed stated that they had reached an understanding that "as the price of the shares go up, I would sell my shares and have this loan paid off. So that was a clear understanding that appreciation equals higher money coming in. . . . We never had a timetable of when that would happen." (Tr. 269.)

{¶ 73} In October 2018, Al received an email from Ed stating that the stocks in the Merrill Lynch account were growing and that it was time to start liquidating them. By March 2019, the account reached $733,055, which Al agreed was the highest the account had been to date. At that time, there was confusion as to whether Ed was able to sell shares from the Merrill Lynch account but his broker eventually informed him that he could sell shares as long as the proceeds stayed in the account for payment towards the loan. (Tr. 271.) Therefore, the trial court's decision regarding liquidating the account and selling shares was based on competent, credible evidence within the record.

{¶ 74} Based on the totality of the evidence discussed above, we find that the manifest weight of the evidence does not demonstrate that the trial court erred in performing the calculations as it did and determining that Ed had been overpaid.

{¶ 75} Ed's second assignment of error is therefore overruled.

## C. Violation of Fiduciary Duty and Removal of Trustee

{¶ 76} In his third assignment of error, Ed contends that the trial court erred in failing to find that Al violated his fiduciary duties and in keeping him as the trustee of the trust. Once again, we interpret this assigned error as arguing that the trial court's determination regarding breach of fiduciary duty was against the manifest weight of the evidence and apply the same standards discussed above. A court's decision regarding the removal of a trustee is reviewed for an abuse of discretion. *In re Estate of Jarvis*, 67 Ohio App.2d 94, 97 (8th Dist. 1980).

{¶ 77} To prove breach of fiduciary duty, Ed was required to prove "(1) the existence of a fiduciary duty; (2) the failure to observe the duty; and (3) an injury resulting proximately therefrom." *DPLJR, Ltd. v. Hanna*, 2008-Ohio-5872, ¶ 19 (8th Dist.), citing *Strock v. Pressnell*, 38 Ohio St.3d 207, 216 (1988). "So long as a trustee acts in good faith and within the limits of sound execution of the trust vested in him, a court of equity will not undertake to substitute its discretion for that of the trustee, or interfere with that discretion." *Hopkins v. Cleveland Trust Co.*, 163 Ohio St. 539, 548 (1955).

{¶ 78} In support of this assignment of error, Ed cites to several sections under R.C. Ch. 5808 and asserts that Al violated these sections, thus violating his fiduciary duty. Under R.C. 5808.15(B), "[t]he exercise of a power [by a trustee] is subject to the fiduciary duties prescript by Chapter 5808 of the Revised Code." Thus, there is no question that Al owed a fiduciary duty to Ed. Rather, the issue that Ed

contests relates to the trial court's determination that Ed did not prove the third prong — that he was injured by Al's alleged failure to observe his fiduciary duties.

{¶ 79} On appeal, Ed appears to offer the following arguments as evidence that Al's alleged breach of duty injured him: (1) "Al . . . allow[ed] the value of the Merrill Lynch account to drop by almost 50%, and fail[ed] to liquidate stocks to satisfy the loan when it was near its peak value"; (2) "Al attempted to impose a totally self-interested transaction on the Trust, namely confiscating Ed's shares in the Merrill Lynch account, and imposing repayment terms on the loan"; and (3) "Al's breaches of fiduciary duty caused Ed to suffer losses of hundreds of thousands of dollars in lost Trust and Estate assets, not counting attorney fees." We note that despite these allegations of damages, Ed concedes that the trial court rejected Al's arguments to the contrary, acknowledged that Al did not provide any accountings until about 2018, and then acknowledged that Al did not support his spreadsheet with actual documentation from Merrill Lynch.

{¶ 80} The trial court found that despite all of this, Ed was not damaged and indeed benefitted from these actions. We agree, and we note that taking out the loan on the Merrill Lynch account instead of merely liquidating it was Ed's choice and inured to Ed's benefit. We find Ed's arguments disingenuous — Ed appeared to acquiesce to Al's management of the Merrill Lynch account, did not seem to rush to pay off the $150,000 loan, and did not begin to inquire about accounting or selling shares until he needed more money himself, nearly five years after the estate case had closed. Ed benefitted from Al's alleged "breaches" of his duty as trustee in that

he was not under any time constraint to pay back his loan and he was enabled to keep the funds so long as the Merrill Lynch account remained open and had sufficient funds to support the loan.

{¶ 81} Ohio courts have long held that acquiescence to actions by a trustee that the beneficiary had full knowledge of as well as benefits received because of a trustee's actions estops a beneficiary from later complaining if the activity did not turn out as hoped or expected. *See, e.g.*, *May v. Copeland*, 2010-Ohio-6493, ¶ 54 (5th Dist.) ("[A] beneficiary cannot hold the trustee liable for an act or omission of the trustee as a breach of trust if the beneficiary prior to or at the time of the act or omission consented to it."); *Hopkins*, 163 Ohio St. at 551 (A beneficiary who consents to, confirms, or acquiesces in a claimed breach of trust in making certain allocations is estopped from claiming breach of trust.).

{¶ 82} Even so, we note that Ed fails to provide an exact number of damages and merely asserts that he has lost "hundreds of thousands of dollars" as a result of Al's conduct, without making any calculations or demonstrating how Al's alleged breaches of duty caused financial losses. The trial court's reasoning, on the other hand, is supported by competent, credible evidence within the record.

{¶ 83} Ed argues that "the fact that Al attempted to violate so many additional fiduciary duties should have made the Court more inclined to find that Al violated fiduciary duties and to remove him." However, "[t]he removal of a trustee is a drastic action which should only be taken when the estate is actually endangered, and intervention is necessary to save trust property." *In re Estate of Winograd*, 65

Ohio App.3d 76, 81 (8th Dist. 1989). Ed has not demonstrated as much, and we do not find that the facts before us demonstrate a situation where the trustee should be removed.

{¶ 84} The trial court did not err in finding that Ed did not prove his damages pursuant to Al's alleged breaches of fiduciary duties, nor did the trial court err in refusing to remove Al as trustee. The record supports competent, credible evidence supporting both of the trial court's decisions.

{¶ 85} Accordingly, Ed's third assignment of error is overruled.

### D. Coins, Automobile, House, Ameriprise Account

{¶ 86} In his fourth assignment of error, Ed argues that the trial court erred in determining that "no evidence was presented to show the current value of the Euclid residence" and that "Ed is precluded from pursuing his claims to half the value of the automobile and coin collection because neither were listed on the Estate Inventory." Once again, because these relate to factual findings by the trial court, we review whether these findings are against the manifest weight of the evidence.

{¶ 87} We first address the Euclid residence. The trial court found as follows:

In addition to his assertion that he is entitled to a share of the Merrill Lynch account, [Ed] also argues that [Al] breached his fiduciary duty by failing to maintain and sell the Euclid property, causing loss to the value of the Trust.

The Court finds that the emails between Al and Ed contained in Plaintiff's Exh 7 demonstrate that Ed had the use and control of the Euclid property from 2013 until about 2018 when he began to complain about the expense of upkeep of the house. Ed acknowledges his use of the house, including the fact that his personal belongings and vehicle are stored there. The Court finds that by Ed's own testimony, the

property was barely habitable even in 2013. The Court finds that no evidence was presented to show the current value of the property.

{¶ 88} Ed appears to argue that the house, as a Trust asset, needed to be liquidated and distributed, "not treated as if it was non-existent and thus that it would pass to Al free and clear of any claim of Ed." We find this claim unsupported by the record. The house is within the Trust, which specifies that each brother gets 50 percent of all contents of the Trust. Thus, the Euclid house, like any other asset in the Trust, is to be split equally between the two brothers when sold.

{¶ 89} Ed raises several arguments regarding the coins and automobile but supports none of them with law. The trial court concluded as follows, regarding these assets:

> The Court finds that [Ed] also testified and provided documents regarding coins and a vehicle owned by the decedent that he claims were retained by [Al]. While [Al] refuted this testimony the Court finds that Plaintiff is precluded from pursuing his claims because neither the coins nor the car were listed on the Estate inventory and Plaintiff failed to file exceptions thereto.

{¶ 90} As the trial court did, we note that the coins and the automobile were both omitted from the final inventory in the probate matter and that there was no objection to the final inventory. The trial court's decision is supported by competent, credible evidence in the record, and we are not inclined to reverse on manifest weight grounds.

{¶ 91} Despite listing the Ameriprise account under this assignment of error, Ed does not offer any arguments in support thereof. We therefore disregard the portion of the assignment of error as it pertains to the Ameriprise account.

{¶ 92} Ed's fourth assignment of error is therefore overruled.

**E. Exclusion of Expert**

{¶ 93} In his sixth and final assignment of error, Ed contends that the trial court erred in excluding his expert, Robert Ranallo ("Ranallo"), from testifying and not accepting the expert report into evidence nor allowing Ranallo to testify.

{¶ 94} On May 1, 2023, Ed, for the first time, indicated on his witness list that Ranallo would testify at trial as to how the Merrill Lynch loan should be treated in dividing up the remaining funds in the Merrill Lynch account. On May 12, 2023, Ed filed Ranallo's expert report. The court refused to accept the report and excluded Ranallo's testimony because the court's case-management order specifically provided that all expert witnesses and reports were due on August 31, 2022. Ed takes issue with this and argues that the trial court erred in excluding Ranallo's report and preventing him from testifying.

{¶ 95} The admission of expert testimony is a matter within the sound discretion of the trial court. *Scott v. Yates*, 71 Ohio St.3d 219, 221 (1994). "A trial court has discretion to set a deadline by which the parties have to disclose their expert witnesses and to enforce its order by excluding all testimony from experts not disclosed by the deadline." *Huffman v. Pioneer Basement Water Proofing Co.*, 2008-Ohio-7032, ¶ 33 (5th Dist.), citing *Paugh & Farmer, Inc. v. Menorah Home for Jewish Aged*, 15 Ohio St.3d 44 (1984), and *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83 (1985).

{¶ 96} Ed argues that at the pretrial on February 17, 2023, the court extended the time in which Ed could provide an expert report. This pretrial was not recorded, and there is no transcript of the pretrial. Ed cannot support his contention with any evidence, Ed did not file a motion for extension of time that is in the record, and Ed did not set forth any arguments demonstrating good cause for missing the expert deadline.

{¶ 97} The trial court did not abuse its discretion in excluding Ranallo's report and testimony. We overrule Ed's final assignment of error.

### III. Conclusion

{¶ 98} Ed's arguments regarding the statute of limitations, the trial court's factual findings, the trial court's method of calculation, and the trial court's exclusion of Ranallo's expert report and testimony are without merit.

{¶ 99} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
FRANK DANIEL CELEBREZZE, III, JUDGE

MICHELLE J. SHEEHAN, P.J., and
EILEEN T. GALLAGHER, J., CONCUR